73 A.3d 306

Howard Bay DIGGS

v.

STATE of Maryland.

and

Traimne Martinez ALLEN

v.

STATE of Maryland.

Nos. 932, 929, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Aug. 28, 2013.

Nancy S. Forster, Towson, MD, Peter F. Rose (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Brenda Gruss (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., KEHOE, ROBERT B. KERSHAW (Specially Assigned), JJ.

KEHOE, J.

After a seven day trial by jury in the Circuit Court for Montgomery County, co-appellants Traimne Martinez Allen and Howard Bay Diggs were convicted of attempted first degree murder, first degree burglary, attempted robbery with a deadly weapon, robbery with a deadly weapon, conspiracy to commit robbery, two counts of first degree assault, and two counts of using a handgun in the commission of a crime of violence. The charges arose out of an alleged home invasion

and robbery that occurred in Montgomery County on June 23–24, 2009.

On appeal, appellant Allen presents the following questions for our review, which we have expanded, reordered, and rephrased:

I. Did the trial court err in prohibiting the defense from introducing evidence that DNA samples obtained from items recovered at the crime scene produced Combined DNA Index System "matches" to persons other than appellants?

II. Did the trial court err in admitting DNA evidence without supporting contextual statistical data?

III. Did the trial court err in denying appellants' motion for mistrial when the prosecutor asked certain improper questions during the direct examination of a witness?

IV. Did the trial court err in denying Allen's motion for mistrial when the prosecutor stated during opening statement that Allen was unemployed?

V. Did the trial court err in prohibiting Allen from eliciting exited utterances made by a co-defendant who was tried separately?

VI. Did the trial court err in its determination that a letter written by Allen, addressed to his girlfriend, did not fall within the attorney-client privilege and did not constitute attorney work product?

VII. Did the trial court err in instructing the jury as to accomplice liability?

VIII. Was the evidence legally sufficient to support appellants' convictions for attempted first degree murder?

Appellant Diggs joins Allen in questions I, III, VII, and VIII, and adds the following, which we have reordered and rephrased:

I. Did the trial court err in its determination that a statement contained in a police report was inadmissible because it constituted hearsay?

II. Did the trial court err in allowing the prosecution to comment on Diggs' demeanor during closing argument?

Perceiving no reversible error, we will affirm the decisions of the trial court.

## BACKGROUND

On March 29–31 and April 1–2, 5–6, 2010, Allen and Diggs were tried jointly before a jury on the aforementioned charges. The State called eighteen witnesses to testify in its case-in-chief. This evidence, taken in the light most favorable to the State as the prevailing party, established the following:

### Negussie and Gordon

On the night of June 23, 2009, Sentayehu Negussie and Jeremy Gordon picked up their ex-girlfriends, Lazoya King and Shavon Jackson, along with Jackson's cousin, Chantel Fletcher, from the Shady Grove metro station in Montgomery County, Maryland. The group drove to a gas station in Takoma Park, where Gordon bought drugs, and then continued to drive around for an hour or two while smoking marijuana and ingesting ecstasy. They eventually returned to the apartment Negussie and Gordon shared, which was located near Rockville, in Montgomery County. Jackson was last into the apartment, and intentionally left the door unlocked.

Within minutes of their arrival, three men—Diggs, Allen, and an associate named Alex "Gutta" Harris—slammed through the apartment door. Allen and Diggs had dreadlocks and wore bandanas or scarves over their faces. Harris wore a baseball hat turned backwards, and a bandana which did not cover his face. Diggs was pointing a gun. The men ordered Negussie and Gordon to drop to the floor. Negussie obeyed and dropped to the floor, where his hands were bound together behind his back using duct tape. He was then punched and kicked in the head, and his arm was sliced with a knife (eventually requiring fifteen stitches). Gordon refused to go the floor, and a fight ensued. During the fight, Gordon was punched in the face, kicked in the face and torso, stabbed in

the right arm with a knife, and, according to Jackson, "pistol whipp[ed]" by Diggs. Gordon was forcefully dropped to the floor at some point during the fight, and his hands were bound together behind his back using duct tape.

Once Negussie and Gordon were subdued, the intruders proceeded to take various items from the apartment, including cash, drugs, a PlayStation, and Negussie's wallet, watch, and sneakers. While the men were in the process of collecting items, Gordon broke free from the duct tape bindings, jumped up, and ran toward a sliding glass backdoor that led out of the apartment. Shots were fired, the glass door shattered, and, as he exited the apartment or immediately thereafter, Gordon was hit in the lower back by a bullet. As he ran away, he encountered a police officer—Sergeant Wyne—who tended to his wounds and called for medical assistance.

### Jackson, King, and Fletcher

Jackson, King, Gordon, and Negussie knew each other for about one year prior to the above-described incident. During much of this period, Jackson dated Gordon, and King dated Negussie. These relationships eventually ended on poor terms. A short time later, Jackson began dating Alex Harris, and King began dating Diggs.

According to Jackson, at some point during the day on June 23, 2009, she and Harris had a conversation about "robbing somebody" for "money or drugs." Later that evening, while at her apartment, she and King decided to "set[ ] up" Gordon and Negussie because they were known to keep drugs and "a big wad" of cash in their apartment. Jackson first called Gordon, but he didn't answer his phone. King then called Negussie, who answered and agreed that he and Gordon would pick up the women later that evening at the Shady Grove metro station.

Soon thereafter, Harris and Diggs arrived at Jackson's apartment. Together, Jackson, King, Harris, and Diggs devised a plan to carry out the robbery. Pursuant to this plan, Jackson would grant Harris and Diggs access to the Gordon–

Negussie apartment. Upon their entry into the apartment, Diggs, wielding a gun, would order everyone inside the apartment to the floor. Harris and Diggs would then tie up Gordon and Negussie, kick and punch them a few times, and, finally, search the apartment for cash and drugs. According to Jackson, once the plan was formulated, "[w]e basically did like a little act out plan of what we was going to do." While the group was rehearsing, Fletcher—Jackson's cousin—arrived at the apartment and joined in on the scheme.

Around 9 p.m. that night, Allen arrived in a green Buick and picked up Jackson, King, Fletcher, Harris, and Diggs. As they drove, the group continued to discuss and further plan out the robbery. They first arrived at and scouted out the area surrounding the Gordon—Negussie apartment. The group then drove to the Shady Grove metro station, where Jackson, King, and Fletcher exited the Buick.

An estimated fifteen minutes later, Gordon and Negussie arrived at the metro station and picked up Jackson, King, and Fletcher. While the group was driving around and doing drugs, Jackson kept Harris abreast as to their activities and whereabouts via periodic text messages. After joyriding for an hour or two, Gordon and Negussie drove the women back to their apartment. Jackson was the last to enter, and intentionally left the door unlocked. She and Fletcher then went to the bathroom, where they contacted Harris and informed him that the group had arrived at the apartment and that the door was unlocked.

Soon thereafter, Harris, Diggs, and Allen burst through the front door of the apartment. Jackson testified that Diggs wore "a red bandana" over his face and "[k]haki shorts, white t-shirt, and brown converse [shoes];" Harris wore a "black bandana" over his face, a black hat turned around backwards, and "[a]ll black, a black shirt, black shorts and black sneakers;" Allen wore "a black scarf" over his face and head and "blue jeans and a white t-shirt." According to Jackson, Diggs "was pointing a gun and[ ] told everyone to get down. . . ." Gordon and Negussie were subsequently beaten, subdued, and

then robbed of drugs, cash, and other items. At some point during the robbery, Jackson, King, and Fletcher exited the apartment. On the way out, King grabbed a knife from the carpet, and Jackson heard "gunshots." The three women walked to a nearby 7–Eleven, tossing the knife into bushes along the way. They were then apprehended by police officers and arrested.

### The Police

Unbeknownst to the participants in the events we have described, Montgomery County police officers were present in force in the vicinity of the Gordon–Negussie apartment when the home invasion occurred. Police officers wearing plain clothes were in the area conducting surveillance as part of an investigation into a recent series of automobile thefts. In the course of these efforts, two officers, Sergeant Wyne and Officer Drengwitz, observed three men—Harris, Diggs, and Allen—standing at the rear of a green Buick parked on a side street. Sergeant Wyne and several other officers followed the men to a nearby 7–Eleven.

While the men were inside the store, Officer Drengwitz approached the parked Buick and observed that it contained a black and gray backpack, one black bandana, one red bandana, two pairs of sneakers, and one pair of white gloves.

Another officer, Officer Chmiel, observed the men inside the 7–Eleven. Officer Chmiel described one of the men as having dreadlocks and wearing "a black sweatshirt, hooded sweatshirt, and a pair of khaki cargo shorts" and "dark-colored canvas shoes." Another of the men wore "all black, black pants, black shirt, and a backwards black baseball cap" with a "white design." The third man had "dreadlocks" and "was also in all black, black shorts, black shirt, and a black Pittsburgh Pirates hat that was being worn backwards."

The 7–Eleven's surveillance video, which was admitted into evidence, depicted the above-described men—including several shots of their faces from multiple angles—purchasing, among other items, three pairs of gloves from the store. The video

also showed that at least one of the men wore a white undershirt beneath a black t-shirt, and that one of the men was laughing and smiling.

After a few minutes, the men exited the 7–Eleven and returned to the Buick. Sergeant Wyne took a position nearby the Gordon–Negussie apartment, and, soon thereafter, observed a black Hyundai pull into the apartment's parking lot and at least one man—Gordon—and three women—Jackson, King, and Fletcher—exit the vehicle and enter one of the apartments. Sergeant Wyne testified that he could not see whether anyone else stepped out of the front passenger side of the Hyundai.

According to Sergeant Wyne, five to ten minutes later, the green Buick arrived on the scene, its driver "just absolutely floor[ing] it, really fast ... like, raced the engine, went all the way up the parking lot, and I saw it go around the corner. I mean, really, I could hear the tires screeching...." The Buick parked nearby, and Officer Drengwitz observed three men exit the Buick, wearing "all dark clothing" with "hoodies[ ] up." Their faces were not visible. Officer Drengwitz watched the men "jog[ ] over" to and enter the Gordon–Negussie apartment complex. One of the men carried the black and gray backpack.

Five minutes later, Jackson, King, and Fletcher exited the apartment. They stood for a moment in the parking lot. Sergeant Wyne described them as acting "very agitated." As the women were "scurrying" from the parking lot, gunshots sounded. According to Sergeant Wyne, there were two rounds of gunshots. The first was a "volley of muffled gunshots," "four to five shots" that, in Wyne's opinion, came "from indoors." The second round was a series of seven to ten "very loud gunshots" that "were clearly outdoors." Officer Drengwitz testified that, from his vantage point, he witnessed Gordon—now outside the apartment—being chased by Harris, Diggs, and Allen, one of whom had a gun and was

shooting at Gordon. The three men eventually gave up their pursuit of Gordon and returned to the Buick.

Upon sound of the gunshots, Sergeant Wyne approached the apartment complex, where he encountered Gordon fleeing from the scene. The Sergeant described Gordon as having "a lot of blood coming between his fingers" which were placed over "his midsection" as well as "a serious amount of blood coming out of his mouth and nose, down his face." Sergeant Wyne tended to Gordon's wounds and called for medical assistance.

Back at the Buick, Harris, Diggs, and Allen crouched low beside the car. Once the car was unlocked, one of the men— Harris—jumped into the passenger seat. Before the other two could get inside, police cruisers approached and blocked the Buick's escape. The two men outside the vehicle fled immediately. Harris jumped out of the car and fled. Officer Hall chased Harris, caught up to him, and placed him under arrest. During the chase, Officer Hall observed several items, including a bag and a baseball hat, on the sidewalk. A knife was recovered from Harris's person. Neither Allen nor Diggs were apprehended.

Other officers secured the crime scene. They discovered Negussie in the apartment's bathroom, his hands tied and, according to Hall, he "was bleeding from a wound to his right arm." Detective Patricia Poulos, a forensic services detective, recovered various items from the apartment, the Buick, and the nearby area. These items included a partially loaded nine millimeter handgun, which was recovered "under the right rear passenger side door" of the Buick; a bag containing sneakers, a backpack containing a PlayStation, a black bandana, a pair of gloves, and several bullet casings and fragments, all of which were recovered from the nearby street and sidewalk; a black glove, a black bandana, and a baseball hat, which were recovered from inside the apartment's stairwell; a black t-shirt recovered from behind the apartment building; and a black Pittsburgh Pirates baseball hat, an empty orange juice bottle, and documents bearing Allen's name, which were

recovered from the Buick.[1] A firearms examiner later determined that the fragments and casings recovered from the scene had been fired from the handgun found beneath the Buick.

The police also recovered Harris's cell phone and searched its contents pursuant to a search warrant. The phone's contact list included entries for "Diggs" and "Diggs House."

### Stipulations

The parties stipulated that fingerprint evidence obtained from the handgun failed to implicate Diggs, and that, at the time of the robbery, Harris was wearing a bandana. They also stipulated as to the extent of the injuries received by Gordon and Negussie during the incident.

### DNA Evidence

DNA samples were taken from both of the black bandanas, the Pittsburgh Pirates baseball hat, the black t-shirt, and the orange juice bottle. The State, in its case-in-chief, did not present DNA evidence. Appellants, in their defense, called Naomi Strickman—their sole witness—as a DNA expert to testify about the samples taken. We will discuss Ms. Strickman's testimony in greater detail in Parts I and II.

### Jackson's Plea Bargain

In return for her testimony, the State entered into a plea bargain with Jackson wherein Jackson agreed to plead guilty to first degree burglary, robbery with a deadly weapon, and first degree assault for her role in the home invasion. During her testimony, Jackson implicated herself in the above-described scheme, admitted to using drugs while with Gordon and Negussie and on prior occasions, and admitted that she lied to the police after she was arrested and to the State's Attorney's Office. The terms of Jackson's plea agreement were admitted into evidence at trial.

---

1. The Buick's trunk was filled with an assortment of bags, articles of clothing, hats, shoes, and other items.

## The Verdicts and Sentences

After deliberating, the jury convicted Allen and Diggs of attempted first degree murder, first degree burglary, attempted robbery with a deadly weapon, robbery with a deadly weapon, conspiracy to commit robbery, two counts of first degree assault, and two counts of using a handgun in the commission of a crime of violence. They were each sentenced to serve a total of life plus ninety years imprisonment. Specifically, they were sentenced to life imprisonment for their convictions for attempted first degree murder, and to sentences of twenty years imprisonment for attempted robbery with a dangerous weapon, twenty years imprisonment for robbery with a dangerous weapon, twenty years imprisonment for conspiracy to commit robbery, twenty years imprisonment for first degree burglary, and five years imprisonment for each count of using a handgun in the commission of a crime of violence (the remaining counts merged). The latter sentences were run concurrent with each other, but consecutive to the sentences for attempted first degree murder.

This appeal followed.

## DISCUSSION

### I. Introducing Evidence of CODIS Matches

DNA samples were taken from five items recovered from the crime scene: the Pittsburgh Pirates baseball hat and an orange juice bottle, both of which were recovered from the Buick; a black t-shirt found behind the Gordon–Negussie apartment building; a black bandana recovered from the nearby street or sidewalk; and, lastly, a black bandana recovered from inside the apartment's stairwell. The DNA samples were analyzed by the Montgomery County Crime Laboratory and corresponding DNA records were uploaded to the Combined DNA Index System ("CODIS"), an index of DNA profiles managed nationally by the Federal Bureau of Investigation ("FBI"), and implemented locally by state and municipal law enforcement authorities.[2] Two of the samples upload-

---

2. In Maryland, PS § 2–501(c) defines CODIS as follows:

ed produced what are known as "matches" to DNA records in CODIS associated with individuals other than appellants: first, one of the black bandanas produced a "match" to a man named Mohamed Bangora; second, the orange juice bottle produced a "match" to a man named Richard Debreau. As we will explain, for the purposes of CODIS, "match" is a term of art, with a very specific meaning. No additional testing and/or analysis was completed on these samples.

At trial, the prosecution did not introduce DNA evidence in its case-in-chief. Appellants, in their defense, called and certified Naomi Strickman—a forensic specialist with the Montgomery County Crime Laboratory—as a DNA expert to testify about the samples collected and the results of the CODIS search. Before Strickman testified, the prosecution moved in limine to prohibit Strickman from testifying about the CODIS matches to Bangora and Debreau. In support of this motion, the prosecutor argued that introduction of evidence of a CODIS match, where, as here, no additional testing had been completed to verify the match, was prohibited by Md.Code Ann. (2003, 2009 Supp.) § 2–510 of the Public Safety Article ("PS"). The prosecutor also argued that evidence of the CODIS match constituted hearsay because Strickman was not the person who ran the CODIS search; that the CODIS match was irrelevant because other evidence—including several eyewitnesses, the surveillance video and, in Allen's case, other DNA evidence—placed appellants at the scene of the crime; and that the probative value of the CODIS matches, if any, was outweighed by a high potential that evidence of the matches would distract and confuse the jury. On the last point, the prosecutor argued that, if evidence of the CODIS matches were admitted at trial, then the prosecutor would seek to admit evidence that Debreau was a known gang

---

(c) *CODIS*—(1) "CODIS" means the Federal Bureau of Investigation's "Combined DNA Index System" that allows the storage and exchange of DNA records submitted by federal, state, and local forensic DNA laboratories.

(2) "CODIS" includes the national DNA index administered and operated by the Federal Bureau of Investigation.

member, and that appellants were members of, or affiliated with, gangs known to use kits designed to contaminate DNA evidence at crime scenes. This, according to the prosecutor, would create a mini-trial on the issue of whether appellants were, in fact, involved with such gangs, and whether such a kit was employed in the instant case.

In response, appellants asserted that evidence of the CODIS matches was relevant and, more so, had exculpatory value, both because it suggested that Bangora and Debreau were at the scene of the crime, and because Debreau had been previously convicted of a home invasion.

After considering these arguments, the trial court granted the motion in limine, adopting the arguments set forth by the prosecutor. The trial court did, however, permit Ms. Strickman to testify that the DNA on the black bandana and the orange juice bottle did not match the DNA of Allen or Diggs.

On appeal, both Allen and Diggs assert that the trial court erred in excluding evidence of the CODIS match because, in their view, it was exculpatory. By excluding it, appellants argue that the trial court violated their Sixth Amendment and Due Process rights and the rights guaranteed them under Article 21 of the Maryland Declaration of Rights. For the reasons set forth below, we disagree. In order to place these arguments in their proper context, we will first provide a brief overview of the types of DNA evidence recoverable from a crime scene, and address how this evidence is analyzed and its value in identifying or exculpating criminal suspects. We will next provide an overview of CODIS, how it produces a "match," and the significance of such a match. We will then turn to the parties' arguments in the instant case.

## 1. Types of DNA

Human cells contain two genes capable of being analyzed for DNA: mitochondrial DNA (mtDNA) and nuclear DNA (nDNA). *See* Julian Adams, *Nuclear and Mitochondrial DNA in the Courtroom*, 13 J.L. & POL'Y 69 (2005). We will take each of these genes in turn.

### a. Mitochondrial DNA

Mitochondrial DNA is the smaller of the DNA genes and is found within an organelle called the mitochondrion which floats "in the cytoplasm surrounding the nucleus of a cell." *Wagner v. State,* 160 Md.App. 531, 544, 864 A.2d 1037 (2005); *see* Adams, at 71–72. Mitochondrial DNA is generally recoverable from "evidence containing naturally shed hairs, hair fragments, bones, and teeth." LABORATORY DIVISION, FEDERAL BUREAU OF INVESTIGATION, HANDBOOK OF FORENSIC SERVICES, 34–35 (2007) [hereinafter "Handbook"], http://www.fbi.gov/about-us/lab/handbook-of-forensic-services-pdf. It exists in the shape of a double helix, and, "if the double helix structure of the mtDNA is stretched out, the exact order of As, Ts, Cs, and Gs in the mtDNA molecules of one person can be determined." [3] *Wagner,* at 544–45, 864 A.2d 1037. While it is "very unlikely that any two people will have the same order of their ATCGs in the control region of mtDNA ... [this type of DNA] is not a unique identifier, because any other person in the same maternal lineage will have the same type." *Id.* at 545, 864 A.2d 1037; *see* Handbook, at 35 (maternally related relatives and immediate family members may have the same mitochondrial DNA). For this reason, mtDNA can be, but is not often, used for purposes of identification. *Wagner,* at 545, 864 A.2d 1037. Instead, it is most often used as a method of exclusion, employed in cold cases and to track the whereabouts of missing persons. *See id.;* Handbook, at 35, 40–44.

### b. Nuclear DNA

Nuclear DNA is the larger of the DNA genes. Often referred to as the "human genome," it is found in "chromosomes located within the nucleus of all human cells." *Maryland v. King,* ⸺ U.S. ⸺, 133 S.Ct. 1958, 1966–67, 186 L.Ed.2d 1 (2013); *see* Adams, at 71–72. It is generally recoverable from "evidence containing blood, semen, saliva, body tissue, and hairs that have tissue at their root ends."

---

**3.** The ATCGs—adenine, thymine, cytosine and guanine—are molecules, more specifically nucleotides, found in mtDNA.

Handbook, at 34. As the Court of Appeals recently explained in *Whack v. State*, analysis of nDNA:

focuses on repeated DNA sequences scattered through the human genome, known as short tandem repeats (STRs). The alternative possibilities for the size and frequency of these STRs at any given point along a strand of DNA are known as alleles, and multiple alleles are analyzed in order to ensure that a DNA profile matches only one individual.

433 Md. 728, 739 n. 6, 73 A.3d 186, 2013 WL 4436602 at *4 n. 6 (2013) (quoting *King*, 133 S.Ct. at 1967 (internal citations and quotation marks omitted)). In contrast to mtDNA, by studying and comparing alleles in nDNA, forensic scientists are able to determine "whether a biological tissue matches a suspect with near certainty," *King*, 133 S.Ct. at 1967 (quoting *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 62, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009)), except in the case of identical twins. *See Young v. State*, 388 Md. 99, 106, 879 A.2d 44 (2005). There are several methods of testing nDNA samples which have emerged in the last two decades, *see United States v. Davis*, 602 F.Supp.2d 658, 664–672 (2009) (discussing various methods of DNA testing), but currently the most commonly used of these is the polymerase chain reaction method. This method employs a technique called electrophoresis which places the nDNA in an electric field encased in a gel to separate the alleles by size on thirteen core STRs. *See, e.g., Young*, 388 Md. at 108, 879 A.2d 44 (quoting *Gross v. State*, 371 Md. 334, 339 n. 1, 809 A.2d 627 (2002) (discussing the polymerase chain reaction method of nDNA analysis)); Adams, at 75–77 (same). These thirteen core STRs are then analyzed and a numerical representation of the information retrieved—called a DNA profile—is generated. *See* FEDERAL BUREAU OF INVESTIGATION, NDIS OPERATIONAL PROCEDURES MANUAL 80 (2013) [hereinafter "NDIS Manual"], http://static.fbi.gov/docs/NDIS-Procedures-Manual-Final–1– 31–2013–1.pdf (A DNA profile is "[t]he genetic constitution of an individual at defined locations (also known as loci) in the DNA. A DNA profile derived from nuclear DNA typically

consists of one or two alleles at several loci (e.g., short tandem repeat loci)...").

## 2. DNA Samples

In Maryland, a "DNA sample" is:

a body fluid or tissue sample that is:

(1) provided by an individual who is convicted of a felony or a violation of § 6–205 or § 6–206 of the Criminal Law Article;

(2) provided by an individual who is charged with:

(i) a crime of violence or an attempt to commit a crime of violence; or

(ii) burglary or an attempt to commit burglary; or

(3) submitted to the statewide DNA data base system for testing as part of a criminal investigation.

PS § 2–501(i); *see also* NDIS Manual at 81 (DNA sample "means a tissue, fluid, or other bodily sample of an individual on which a DNA analysis can be carried out.").

### a. Samples Obtained from Individuals

To rephrase in simpler terms, there are two general classifications of DNA samples recognized under PS § 2–501(i). The first of these is obtained directly from an individual, usually via cheek swab. To this end, it is well-established in Maryland that law enforcement authorities can obtain DNA samples from individuals convicted, or arrested on the charge, of certain types of crimes, typically crimes of a violent or sexual nature. PS § 2–501(i); *see* PS § 2–501, *et seq.* (setting forth the rules applicable to the collection of DNA samples from the above-mentioned persons); *King,* 133 S.Ct. at 1980 (upholding the constitutionality of state collection of DNA samples from persons properly arrested on accusation of serious crimes); *State v. Raines,* 383 Md. 1, 15, 25, 857 A.2d 19 (2004) (upholding the constitutionality of state collection of DNA samples from convicted persons). Once obtained, the DNA samples are then submitted to certified crime laboratories to be analyzed using one of the above-discussed techniques. *See* PS

§ 2–505 (providing that DNA samples shall be collected and tested for various purposes); *Young,* 388 Md. at 110, 879 A.2d 44 (summarizing the steps involved in certain types of DNA analysis). Information derived from the analysis is used to create a DNA profile, which, in turn, is included in a DNA record. In Maryland, a DNA record has been specifically defined to mean, "DNA information stored in CODIS or the statewide DNA data base system" which includes "the information commonly referred to as a DNA profile." PS § 2–501(h); *compare* NDIS Manual, at 81 (A DNA record is "[a] database record that includes the DNA profile as well as data required to manage and operate [the database]."). The databases in which DNA records are uploaded and stored are maintained by state authorities. *See* PS § 2–505; *Raines,* 383 Md. at 41, 857 A.2d 19. After a DNA profile has been created and a corresponding DNA record uploaded to the appropriate database, the DNA samples are then "stored securely and maintained only" in a statewide DNA repository. PS § 2–506.

### b. Samples Obtained from the Crime Scene

The second classification of DNA samples consists of samples recovered from the crime scene. In this regard, it is becoming increasingly prevalent for investigators to examine items recovered from the crime scene—in the instant case, the hat, orange juice bottle, t-shirt, and bandanas—for DNA evidence. If obtained in sufficient quantity and quality, a DNA profile of this evidence can be created, and a DNA record uploaded to the state databases.

### 3. CODIS

As is relevant to this appeal, DNA records are maintained in the databases in two distinct collections. We will adopt the terminology employed by Justice Scalia, in his dissent in *King:* "One of [the collections] . . . consists of DNA samples taken from known convicts or arrestees. I will refer to this as the 'Convict and Arrestee Collection.' The other collection consists of samples taken from crime scenes; I will refer to this as the 'Unsolved Crimes Collection.'" 133 S.Ct. at 1984 (inter-

nal citations omitted). Using the Combined DNA Index System—CODIS—law enforcement authorities can compare and contrast the DNA records stored in these collections—i.e., compare and contrast the DNA records of crime scene evidence against the DNA records of convicted or arrested individuals.[4] For example, in the instant case, DNA from five items was recovered from the crime scene. DNA records for these items were created and uploaded into the Unsolved Crimes Collection in CODIS. The following illustration is helpful:

| Unsolved Crimes Collection | Convict and Arrestee Collection |
| --- | --- |
| Orange Juice Bottle DNA | Allen's DNA |
| T–Shirt DNA | Diggs' DNA |
| Hat DNA | Bangora's DNA |
| Bandana Number One DNA | Debreau's DNA |
| Bandana Number Two DNA | |

CODIS compares DNA records entered into the Unsolved Crimes Collection against each DNA record in the Convict and Arrestee Collection.[5] For example, in this case, CODIS compared the DNA record for the orange juice bottle against every DNA record stored in the Convict and Arrestee Collection, compared the DNA record for the t-shirt against every

---

4. *See King*, 133 S.Ct. at 1968 ("In short, CODIS sets uniform national standards for DNA matching and then facilitates connections between local law enforcement agencies who can share more specific information about matched STR profiles."); *see also* DNA Identification Act of 1994, 42 U.S.C. 14132 (1994) (authorizing the FBI to establish such a program); NDIS Manual, at 4–6 (summarizing the history of CODIS and explaining some of its basic features and capabilities); PS § 2–501(c). CODIS is maintained by the FBI, but implemented in three parts: at the national level (the National DNA Index System or NDIS), the state level (the State DNA Index System or SDIS), and the local level (the Local DNA Index System or LDIS). *See* NDIS Manual, at 4–6, 20, 27; DNA Initiative, National Institute of Justice, *LDIS, SDIS, and NDIS*, http://www.dna.gov/solving-crimes/cold-cases/howdatabasesaid/ldisndissdis/ (last visited July 10, 2013).

5. The process of comparison is sometimes referred to as "trawling." *See Derr v. State*, 434 Md. 88, 97, 73 A.3d 254, 2013 WL 4482447 (2013), (setting out issues raised on *certiorari*); David H. Kaye, *The Genealogy Detectives: A Constitutional Analysis of "Familial Searching"*, 50 AM.CRIM. L.REV. 109, 120 (2013).

DNA record stored in the Convict and Arrestee Collection, and so on. This comparison may result in a "match" or a "hit" or both, each of which is a narrowly defined term of art.

A CODIS "match" occurs "when CODIS links two or more DNA records and a confirmation process is started by designated laboratory personnel from each affected laboratory [i.e. each laboratory maintaining a sample]." NDIS Manual, at 83. A CODIS match indicates that there is a sufficient level of consistency between the numerical data contained in the DNA records to justify additional testing and analysis of a known physical DNA sample from the individual associated with the DNA record. Accordingly, once CODIS matches the DNA from a crime scene to a DNA record in the Convict and Arrestee Collection, a known DNA sample of the individual associated with the Convict and Arrestee Collection DNA record is generally obtained and then tested and analyzed by the crime laboratory. The data derived from the testing/analysis process is then compared to the DNA recovered from the crime scene in order to determine the likelihood that both samples came from a single individual—i.e., whether the match is sufficiently close to be deemed "confirmed." *See* NDIS Manual, at 44–47, 51, 83; *see also id.* at 44 ("Although this process varies among laboratories, it is intended to verify that no administrative errors occurred while analyzing the offender sample."). A confirmed match becomes a "hit" when it aids in the investigation of an unsolved case. *Id.* at 82; *see id.* at 51 ("Matches and hits are not interchangeable terms or events.").

At trial and in their appellate briefs, the parties in the instant case refer to the CODIS matches to Bangora and Debreau as "hits." This is inaccurate. Ms. Strickman testified that no confirmatory testing was done to verify the CODIS links. Nor is there any indication in the record before us that these matches have aided in the investigation of an unsolved case. Thus, they were "matches" as we have defined the term in this opinion.

The apparent confusion stems, most likely, from the use of the term "match" in different contexts in DNA cases. A CODIS "match"—what we describe above—is the linking of two DNA records stored in CODIS due to similarities in the numeric data contained in the record, where no additional confirmatory testing and analysis has been conducted. A CODIS match probably, but does not always, mean that the two DNA samples represented by the DNA records came from the same person.[6] (That such matches are sometimes interchangeably referred to as "hits" by parties and courts only adds to the confusion). Once CODIS matches DNA records, additional analysis and testing is then completed on the DNA samples in order to determine whether the physical samples, themselves, "match"—i.e., whether, after the physical samples have been tested, compared, and analyzed, they are verified (to a near certain degree) to be from the same person. *See Young,* 388 Md. at 103, 110–12, 879 A.2d 44. It is this latter "match" which is discussed in cases such as *Young,* and which is also sometimes referred to as a confirmation. *See id;* NDIS Manual, at 44–47, 83.[7]

■ The important observation is this: as DNA technology advances, and scientific knowledge about DNA grows, processes and procedures used to analyze DNA evidence evolve, as does the terminology used to describe them. For this reason, when addressing issues involving DNA, parties should always consult with the latest DNA guides and CODIS manuals for updated definitions and procedures. Quotations from older DNA decisions—and appellate decisions age quickly in this area of the law—must be viewed with caution and considered

---

**6.** The converse observation is, however, more reliable (assuming, of course, that no analytical, scientific, or clerical error has been made): if CODIS fails to link the DNA record of an individual with the DNA record created from crime scene evidence, then the DNA found at the crime scene generally does not belong to that individual.

**7.** The term "match" is used in other contexts as well. *See, e.g.,* NDIS Manual, at 52–53.

in the context of the scientific techniques and the terminology discussed in those decisions.

With these observations in mind, we return to the instant appeal.

### 4. Public Safety Article § 2–510

PS § 2–510 provides that: "A match obtained between an evidence sample and a data base entry may be used only as probable cause and is not admissible at trial unless confirmed by additional testing." At trial, the prosecutor argued in support of her motion in limine that the CODIS matches to Bangora and Debreau were inadmissible pursuant to PS § 2–510 because no additional testing of the DNA samples was done to confirm the matches. The trial court adopted this view. Both Allen and Diggs argue that, in so doing, the trial court erred because, in their view, § 2–510 limits only the admission of evidence of CODIS matches in the trials of those individuals to whom the DNA records are associated—i.e., only in the trials of Bangora and Debreau.

This presents a question of statutory interpretation. As this Court recently explained, questions of statutory interpretation are often:

resolvable on the basis of judicial consideration of three general factors: 1) text; 2) purpose; and 3) consequences. Text is the plain language of the relevant provision, typically given its ordinary meaning, viewed in context, considered in light of the whole statute, and generally evaluated for ambiguity. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. An examination of interpretive consequences, either as a comparison of the results of each proffered construction, or as a principle of avoidance of an absurd or unreasonable reading, grounds the court's interpretation in reality.

*Town of Oxford v. Koste*, 204 Md.App. 578, 585–86, 42 A.3d 637 *aff'd*, 431 Md. 14, 63 A.3d 582 (2012) (internal citations omitted).

▉ Applying these rules, we disagree with appellants' interpretation of PS § 2–510 for several reasons. First, their position is not supported by the text of the statute, and, indeed, is contradicted by it. By the plain meaning of § 2–510, evidence of a CODIS match is not admissible *at trial*—any trial, not just the trial of the individual associated with the DNA record—unless additional testing confirms the match. Here, no confirmatory testing or analysis was completed, and, therefore, evidence of the CODIS match was properly excluded at Allen and Diggs' trial. *See King v. State*, 425 Md. 550, 567, 42 A.3d 549 (2012) (the match "may be used[ ] only as probable cause to obtain a warrant to obtain a second sample [from the person associated with the DNA record] and is not admissible as evidence at trial."), *rev'd on other grounds*, *Maryland v. King*, — U.S. —, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013).

▉ Second, this rule makes logical sense. A CODIS match, by itself, is not—at least at the present time—considered to be sufficient confirmation that the two DNA samples represented by the DNA records came from the same person. Instead, the match indicates that there is a sufficient degree of similarity between the identifying characteristics of the DNA records to justify obtaining a known sample of DNA from the individual associated with the profile and testing and analyzing it against the crime scene DNA. The underlying point of PS § 2–510 is to require those wishing to use evidence of a CODIS "match" at trial to test a physical DNA sample obtained from the alleged perpetrator against the physical DNA sample recovered from the crime scene, rather than relying solely on CODIS's matching of the numerical representations stored in its databases.[8] The rule ensures that,

---

8. As stored in CODIS, the DNA records do not contain identifying information. It is only once CODIS indicates a match, and an initial review of the match shows a probability of accuracy, that the purported identity of the individual associated with the matching DNA record is disclosed to the laboratory. Confirmatory testing of DNA samples ensures that the matching DNA records do, indeed, correspond to the indicated individual. *See* NDIS Manual, at 44–47.

before evidence of the "match" is admitted at trial, two DNA samples—one from the alleged perpetrator and one from the crime scene—have been tested, analyzed, and compared using the most recent scientific and technological methodologies available. For this reason, § 2–510 draws a distinction between CODIS "matches" that have been verified by additional testing and analysis, and those that have not. While appellants are surely correct that PS § 2–510 was originally intended, at least in part, to prohibit the admission of unreliable—or not fully reliable—evidence as a basis on which to convict a defendant, we view the converse as equally true; namely, that the same evidence should not be admissible at trial by a defendant as a mechanism to mislead, confuse, or otherwise distract the jury.

This rule appears especially appropriate where, as here, appellants had an opportunity to test, analyze, and compare the DNA samples and failed do so. There is no dispute that, while appellants did request that the Montgomery County Crime Lab perform such tests, the lab was not required to do so at its own expense. There is additionally no dispute that, had appellants requested the proper court order, the lab would have transferred the crime scene DNA samples and the known DNA sample of Debreau in its possession to another certified lab of appellants' choosing for purposes of testing the samples. The Montgomery County lab could not, in any event, comply with appellants' request to test a known sample of Bangora's DNA because the only known sample was maintained, not by Montgomery County, but by the Maryland State Police. Despite their knowledge of this fact, appellants failed to pursue any of the options available to them to have Bangora's DNA tested.

Third, in support of their position, appellants rely entirely on an opinion by the Maryland Attorney General rendered to address whether, under the version of § 2–510 then in effect,[9]

---

**9.** The version of the statute in effect in 2004 read: "A match obtained between an evidence sample and a data base entry may only be used as probable cause to obtain an additional DNA sample from the subject

a CODIS match could be used to establish probable cause for an arrest (as opposed to probable cause to obtain a DNA sample from a suspect). *See* 89 Md. Op. Atty. Gen. 189 (2004). In their briefs, appellants selectively quote a portion of the opinion's conclusion wherein it states: "In our opinion ... [t]he data base match would be inadmissible **at a trial of that individual,** unless the sample obtained pursuant to the search also matches the crime scene DNA" (emphasis added by Diggs). *Id.* at 194. Other portions of the opinion state similar conclusions. *See, e.g., id.* at 192 ("The essence of PS § 2–510 is that **an individual may not be convicted on the basis of a match,** but that the match may only be used for further investigation that may well lead to conclusive evidence of the individual's involvement in the crime." (emphasis added)). However, in our view, when read in context and considered in light of its intended scope, the opinion does not provide, as appellants argue, that the application of § 2–510 is limited solely to the trials of those individuals associated with the matching DNA record. Rather, the opinion is consistent with the plain language of § 2–510—i.e., where, as here, no additional confirmatory testing has been completed, evidence of the CODIS match is inadmissible at trial, regardless of whether it be the trial of the individual associated with the DNA record or anyone else.

Fourth, our construction of PS § 2–510 permits significant leeway to the defense, as the present case illustrates. The trial court permitted Ms. Strickman to testify that the DNA recovered from the bandana and orange juice bottle did not match the DNA of Allen, Diggs, Gordon, Negussie, or Meretle Wilson (a roommate of Gordon and Negussie's not involved in the incident). Counsel for both appellants highlighted these

---

and is not admissible at trial unless confirmed by additional testing." The statute was subsequently amended in 2005 to read: "A match obtained between an evidence sample and a data base entry may only be used as probable cause and is not admissible at trial unless confirmed by additional testing." The current version of the statute, amended in 2012, reads: "A match obtained between an evidence sample and a data base entry may be used only as probable cause and is not admissible at trial unless confirmed by additional testing."

facts in closing argument. Thus, through process of elimination, appellants significantly narrowed the field of potential DNA contributors, thereby creating a strong inference that the DNA left behind belonged to another individual unnamed at trial. The trial court denied only the appellants' ability to name Debreau and Bangora. While the issue has not been addressed by the Court of Appeals, pending a final resolution of the issue from the Court, we hold that such an identification based solely on CODIS "matches" is precisely the type of evidence PS § 2–510 is intended to and does, in fact, prohibit.

### 5. Expert Testimony

As an alternative ground for its ruling, the trial court held that Strickman lacked sufficient personal knowledge of the CODIS matches to testify about them, and that, as a result, her testimony constituted hearsay and was inadmissible. The basis for this conclusion is as follows: When CODIS matches DNA records, it generates what is typically called a "match report." *See* NDIS Manual, at 83 ("After CODIS determines that two or more DNA profiles potentially match, an electronic report [i.e. the match report] is generated by CODIS and automatically distributed to the laboratories responsible for the matching profiles."). Strickman testified that she received such a report, but that she did not generate it because the CODIS program, itself, determines, according to its own criteria, whether two DNA records match. She also testified that she was not the specialist who uploaded the DNA records to CODIS. Strickman did, however, testify that she was capable of interpreting the report.

Allen argues that Strickman, in her capacity as a DNA expert, should have been permitted to testify about the CODIS "matches" pursuant to Rule 5–703(a). That rule provides that: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

We need not, and do not, decide whether Ms. Strickman had sufficient personal knowledge of the CODIS matches to testify about them as an expert. Regardless of Ms. Strickman's level of personal knowledge, we disagree with appellants' contention that Rule 5–703(a) permits parties to admit evidence of a CODIS "match" where no additional testing and analysis has been completed. First, the fact that Strickman testified as a DNA expert does not change our analysis because DNA testimony is always based on specialized knowledge, skill, experience, training, or education. *See Ragland v. State,* 385 Md. 706, 870 A.2d 609 (2005) (the law in Maryland no longer permits opinion testimony based on a witness's specialized knowledge, skill, experience, training, or education, unless they are qualified as an expert witness).

Second, Rule 5–703(a) does not state, as Allen suggests, that an expert who renders an opinion may, in the process, testify about matters explicitly prohibited by statute. To allow an expert witness to testify about CODIS matches in circumstances where no additional testing was completed on known samples is equivalent to providing parties with an end-run around PS § 2–510. Allen has not cited to any authority that convinces us to adopt such a position here.

Third, while there is certainly some level of interpretation involved in reading a "match report," that CODIS matched two DNA records—i.e., indicated that the DNA records may have come from the same person—is a fact, not an opinion. The CODIS program either did, or it did not, indicate during its search that two DNA records matched. Contrary to appellants' assertions, Rule 5–703 does not provide, as an automatic right, that the facts relied on by an expert in rendering an opinion are to be admitted into evidence. Instead, Rule 5–703(b) provides:

> If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert pursuant to section (a) may, in the discretion of the court, be disclosed to the jury even if those facts and data are not admissible in evidence. Upon request, the court shall instruct the jury to use those facts and

data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.

The committee note for this provision provides, in pertinent part, that (emphasis added):

Subject to Rule 5–403, and in criminal cases the confrontation clause, experts who rely on information from others may relate that information in their testimony if it is of a type reasonably relied upon by experts in the field. **If it is inadmissible as substantive proof, it comes in merely to explain the factual basis for the expert opinion.** The opposing party then is entitled to an instruction to the jury that it may consider the evidence only for that limited purpose.

*See Gillespie v. Gillespie,* 206 Md.App. 146, 166, 47 A.3d 1018 (2012) ("The circuit court may, at its discretion, admit inadmissible evidence relied upon by an expert for the limited purpose of evaluating the validity or probative value of an expert's opinion.").

Here, appellants sought the admission of the CODIS matches as substantive evidence—i.e., as proof that Bangora and Debreau perpetrated the crime, and not appellants. They did not seek admission of this fact in order to explain, or as verification of, any opinion provided by Ms. Strickman, nor did they request that the trial court admit the CODIS match evidence for that purpose. Moreover, it appears to us that DNA experts reasonably rely on "match reports" not to definitely determine whether two DNA samples belong to the same person, as appellants suggest, but to determine whether there is a sufficient likelihood that they do, such that additional testing and analysis of known samples should be performed.

In any event, the State contended that Debreau, and perhaps Bangora as well, were members of a home invasion gang that included Allen and Diggs. It was prepared to present evidence to this effect if the CODIS matches were introduced by defense counsel into evidence. As a basis of its ruling, the trial court adopted the prosecutor's contention that the admission of the CODIS matches on these facts would result in a

confusing and distracting mini-trial on gang-related issues. *See* Md. Rule 5–403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). This determination has not been challenged on appeal.

### 6. The Ability to Present an Effective Defense

■■■ Lastly, appellants assert that the trial court's interpretation of PS § 2–510—that it prohibited Ms. Strickman from testifying about the CODIS matches—violates their right to present a defense under the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights. The Sixth Amendment provides, in pertinent part, that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor. . . ." The Sixth Amendment applies to proceedings in Maryland through the Due Process Clause of the Fourteenth Amendment. *See Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense. . . . This right is a fundamental element of due process of law."). Similarly, Article 21 provides, in relevant part: "That in all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath. . . ."

As appellate courts in Maryland and elsewhere have repeatedly emphasized, these rights are "essential to due process." *Foster v. State*, 297 Md. 191, 206, 464 A.2d 986, (1983). As the Court of Appeals in *Kelly v. State*, 392 Md. 511, 898 A.2d 419 (2006) explained:

The right to compulsory process does not end with the ability to subpoena witnesses to show up in court. That

right encompasses the defendant's ability to elicit testimony from those witnesses present at trial:

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. The right is a fundamental element of due process of law."

*Id.* at 535, 898 A.2d 419 (quoting *Wilson v. State,* 345 Md. 437, 448, 693 A.2d 344 (1997))(some internal quotation marks and citations omitted).

Appellate courts have also emphasized that these rights are subject to reasonable regulation. *See Kelly,* 392 Md. at 535, 898 A.2d 419 ("It is the adversarial system of justice which requires that the defendant be given every opportunity, **within procedural and evidentiary boundaries,** to present a defense." (emphasis added)). In *Kelly,* the Court of Appeals explained that "the right to elicit certain types of testimony by opposing counsel, upon proper objection, may be denied...." *Id.* at 535, 898 A.2d 419. Further, the Court observed that: "[t]he right of compulsory process, under both the Federal and State Constitutions, though fundamental, is not absolute. It does not, for example, confer a right to present inadmissible evidence...." *Id.* at 537, 898 A.2d 419. *See also Taylor v. States,* 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly."); *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accom-

modate other legitimate interests in the criminal trial process.").

For the reasons discussed above—including reliability of the evidence, potential to mislead, confuse, and distract the jury, appellants' failure to test the samples, and Ms. Strickman's testimony that appellants were excluded as matches—we conclude that PS § 2–510's requirement that CODIS matches be confirmed by additional testing of the DNA samples before evidence of the match is admissible at trial was a reasonable restriction on appellants' rights. Appellants have not convinced us that the trial court's interpretation and application of § 2–510 to the facts before us violated their rights under the Sixth Amendment or Article 21.

For the aforesaid reasons, the trial court did not err in excluding evidence of the CODIS matches.

## II. DNA Evidence and Statistical Data

■ Allen next argues that the trial court erred in permitting Ms. Strickman to testify during cross-examination: 1) that a mixture of DNA was found on the Pittsburgh Pirates baseball hat and that Allen was a major contributor, and 2) that Allen could neither be included nor excluded as the source of the DNA found on the black t-shirt. Allen argues that the results of these analyses were admitted without supporting population genetics statistical data—i.e., the percentage likelihood that the DNA samples came from Allen—and that the trial court erred in admitting DNA evidence associated with the black t-shirt and baseball hat without such statistics. We disagree.

(As an aside, we note, for purposes of clarity, that, in contrast to the CODIS methodology discussed in Part I, the DNA samples recovered from the Pirates baseball hat and the black t-shirt were tested and compared directly to DNA samples obtained from a cheek swab of Allen.)

In support of his position, Allen relies on *Armstead v. State,* 342 Md. 38, 673 A.2d 221 (1996). In *Armstead,* the Court was asked to evaluate the admissibility of population genetics

statistical data under CJP § 10–915.[10] In concluding that such statistics were admissible under the statute, the Court stated that: "We recognize that some courts have allowed use of DNA match evidence without supporting statistics. We believe, however, that the better approach is to treat the match and the statistics as inseparable components of DNA evidence." *Id.* at 79–80, 673 A.2d 221. Allen interprets this language as permitting the trial court in the instant case to admit the DNA evidence associated with the Pirates baseball hat and black t-shirt only if it was accompanied by supporting population genetics statistical data.

The Court's holding in *Armstead* was, however, modified by the Court of Appeals in *Young v. State,* 388 Md. 99, 879 A.2d 44 (2005). Revisiting the issue, the *Young* Court acknowledged that advances in DNA technology had obviated some of the *Armstead* Court's concerns about the admission of DNA evidence. After summarizing these advances in DNA analysis, the Court concluded:

---

**10.** That section provides, in pertinent part:
 **(b) Validation by standards established by TWGDAM [the Technical Working Group on DNA Analysis Methods] or DNA Advisory Board.** A statement from the testing laboratory setting forth that the analysis of genetic loci has been validated by standards established by TWGDAM or the DNA Advisory Board is sufficient to admit a DNA profile under this section.
 **(c) Introduction of DNA profile evidence.** In any criminal proceeding, the evidence of a DNA profile is admissible to prove or disprove the identity of any person, if the party seeking to introduce the evidence of a DNA profile:
 (1) Notifies in writing the other party or parties by mail at least 45 days before any criminal proceeding; and
 (2) Provides, if applicable and requested in writing, the other party or parties at least 30 days before any criminal proceeding with:
 (i) First generation film copy or suitable reproductions of autoradiographs, dot blots, slot blots, silver stained gels, test strips, control strips, and any other results generated in the course of the analysis;
 (ii) Copies of laboratory notes generated in connection with the analysis, including chain of custody documents, sizing and hybridization information, statistical calculations, and worksheets;
 (iii) Laboratory protocols and procedures utilized in the analysis;
 (iv) The identification of each genetic locus analyzed; and
 (v) A statement setting forth the genotype data and the profile frequencies for the databases utilized.

that there exists methods of DNA analysis employing certain markers that, when tested along a minimum number of loci, yield DNA profiles with an astonishingly small random match probability. When the random match probability is sufficiently minuscule, testimony of a match [11] is admissible without accompanying contextual statistics.

*Id.* at 119, 879 A.2d 44. Applying this standard, the Court ultimately determined that it was not error for the trial court to admit DNA evidence without supporting population genetics statistical data where the expert was able to opine, to a reasonable degree of scientific certainty, that the defendant was the source of the DNA. *Id.* at 103–04, 879 A.2d 44.

Returning to the instant case, with respect to the Pirates baseball hat, the prosecution did not admit population genetics statistical data in support of its DNA evidence. However, Ms. Strickman testified that the DNA recovered from the Pirates hat was sufficient for her to opine that, to a reasonable degree of scientific certainty, "Allen is a source of the major DNA profile obtained from [the hat]." Allen thereafter had an opportunity during re-direct examination to question Ms. Strickman about the bases of her opinion, about the methods used to analyze and compare the DNA obtained from Allen and the hat, among other issues, but he chose not to do so. In light of these observations, we conclude that, under *Young*, the trial court did not err in admitting the DNA evidence related to the Pirates baseball hat.

■ With respect to the black t-shirt, Ms. Strickman testified that Allen could neither be "included nor excluded" as the source of the DNA recovered—in other words, that the DNA analysis was inconclusive. Allen argues that this evidence was irrelevant and, therefore, inadmissible, because it proves nothing. While we agree with Allen that an inconclusive test is evidence of nothing, we also agree with the State that any

---

11. The term "match" employed here is a match of the physical DNA samples, determined after the physical samples, themselves, have been tested, compared, and analyzed. *See Young*, 388 Md. at 103, 110–12, 879 A.2d 44.

error committed in admitting this evidence is harmless beyond a reasonable doubt because evidence of nothing could not prejudicially affect the fairness of Allen's trial.

### III. Bolstering Jackson's Testimony

On numerous occasions during the seven-day trial, counsel for both Allen and Diggs moved for a mistrial. One of these motions was based on the appellants' assertions that the prosecutor attempted, during her direct examination of Jackson, to improperly bolster Jackson's testimony by informing the jury that, prior to the above-described incident, Jackson had no criminal record. The pertinent testimony is as follows:

[PROSECUTOR]: Other than this offense, do you have any other criminal record at all?

[ALLEN'S COUNSEL]: Your Honor, objection.

THE COURT: Sustained.

[JACKSON]: No.

THE COURT: Don't answer.

[ALLEN'S COUNSEL]: Your Honor, I move to—

THE COURT: I know that this is not where you're used to being, but if I sustain an objection, that means you don't answer the question.

[JACKSON]: Oh.

THE COURT: Thank you.

[ALLEN'S COUNSEL]: Move to strike the question and answer

THE COURT: I'll strike it. Thank you. Yes.

A bench conference followed. At the bench, counsel for Allen moved for a mistrial "on the basis of the State attempting to bootstrap the credibility of the witness." Counsel for Diggs joined in the motion. The trial judge denied both requests. At the conclusion of the bench conference, the trial judge explained to the jury, "As I stated earlier, the jury will disregard both the question and the answer."

The prosecutor later returned to the subject, but approached the issue from a different angle. While discussing

with Jackson the terms of her plea agreement, the following exchange occurred:

[PROSECUTOR]: Now there were some conditions of that plea agreement, correct?

[JACKSON]: Yes.

[PROSECUTOR]: I want you to look to the third paragraph there and can you read the first sentence of that third paragraph?

[JACKSON]: "This agreement is contingent on the understanding that your client has no prior criminal record and that her offender score under the Maryland Sentencing Guidelines is zero."

[PROSECUTOR]: Is that true?

[JACKSON]: Yes.

[ALLEN'S COUNSEL]: Objection, Your Honor.

THE COURT: Is what true? * * * Is it true that there was an understanding, is that what your question was?

[PROSECUTOR]: No. I'm asking her whether or not it's true that she has no prior criminal record.

[ALLEN'S COUNSEL]: Objection Your Honor.

THE COURT: Sustained.

[ALLEN'S COUNSEL]: I move to strike and instruct the jury please.

THE COURT: Please disregard the question and the answer.

A bench conference followed. At the bench, counsel for Allen again moved for a mistrial "because the State has [for] the second [time] now attempted to bolster the witness's credibility with inadmissible evidence as to the lack of a prior record." Counsel for Diggs joined in the motion. The trial court again denied both requests.

Appellants' argument as to why the trial court erred in denying their motions for mistrial is two-fold. First, they argue, correctly, that, pursuant to Rule 5–402, "[e]vidence that is not relevant is not admissible." Second, in a related point, they argue that, under *Bohnert v. State*, 312 Md. 266, 539 A.2d

657 (1988) and its progenies, the State is not permitted to bolster witness testimony with irrelevant matters. In *Bohnert*, a child sexual assault victim testified about the alleged abuse. The State then called and certified a social worker as an expert in child sexual abuse. 312 Md. at 271, 539 A.2d 657. The social worker testified that, based solely on the child's representations to her, it was her expert opinion that the child had been abused. The Court of Appeals concluded that this testimony was "tantamount to a declaration by her that the child was telling the truth. . . ." *Id.* at 278–79, 539 A.2d 657. Highlighting that the facts pertinent to the alleged abuse were contested, the Court determined that "the [social worker's] opinion was inadmissible as a matter of law because it invaded the province of the jury in two ways." *Id.* at 279, 539 A.2d 657. First, by "encroach[ing] on the jury's function to judge the credibility of the witnesses and weigh their testimony" and, second, by encroaching "on the jury's function to resolve contested facts." *Id.* The Court ultimately held that "[w]hether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper, either on direct or cross-examination." *Id.* at 277, 539 A.2d 657.

 Returning to the instant case, the trial court violated neither Rule 5–402 nor the principles set forth in *Bohnert.* First, the trial court did not admit irrelevant evidence. In both instances the prosecutor attempted to elicit information relating to Jackson's criminal record, the trial judge sustained defense counsel's objections. Further, on both occasions, the trial judge explicitly instructed the jury to disregard both the question and the answer.[12] Second, not only were the objected to questions and answers stricken from the record and the

---

12. In addition, in its instructions to the jury at the close of evidence, the trial court instructed that: "Inadmissible or stricken evidence must not be considered or used by you. You must disregard questions that I did not permit a witness to answer, and you must not speculate as to the possible answers. If after a question was given, I rule that the answer should be stricken, you must disregard both the question and the answer in your deliberations."

jury properly instructed accordingly, but the questions, themselves, had little tendency to influence the trial in any pertinent way. To this end, regardless of Jackson's criminal record, or lack thereof, she admitted, during her testimony, to partaking in the above-described robbery scheme, to several past instances of illegal activity, and to lying to the police and to the State's Attorney's Office. Defense counsel pressed these issues during cross-examination and argued about them during closing argument.[13] Third, the circumstances of *Bohnert* are not present here. Unlike the social worker in *Bohnert*, Jackson did not give an opinion as to the credibility of testimony elicited from another witness, nor did the disclosure of the fact that Jackson had no prior criminal record encroach upon the jury's role to resolve contested facts or judge the credibility of Jackson's testimony, especially in light of her admitted transgressions.

"The necessity of a mistrial turns on whether the damage in the form of prejudice to the defendant transcended the effect of a curative instruction and deprived appellant of a fair trial." *McIntyre v. State*, 168 Md.App. 504, 524, 897 A.2d 296 (2006). As this Court explained in *McIntyre*, "[a] mistrial is an extreme sanction that sometimes must be resorted to when such overwhelming prejudice has occurred that no other

---

13. Defense counsel also admitted the plea agreement into evidence. At the time of its admission, the question of whether portions of the agreement would be redacted before presentation to the jury was left open. After closing argument, wherein the parties discussed the plea agreement extensively, Allen's counsel reiterated his request to redact the portion of the agreement concerning Jackson's criminal record. The trial judge denied this request, holding that the entire agreement should be submitted to the jury. The trial judge stated to Allen's counsel, "I don't think you send something ... back there that attacks her credibility and take out of it the parts that enhance it...." Allen, in a footnote in his brief, attacks this ruling as being "improper[ ]", but provides no argument as to why it was incorrect, nor authority in support of his attack. We do not, and will not, address such unsupported contentions. *See* Md. Rule 8–504(a)(6); *Kramer v. Mayor & City Council of Balt.*, 124 Md.App. 616, 634, 723 A.2d 529 (1999) (refusing to address an issue not supported in the brief by argument or authority). Diggs does not assert on appeal that the trial court erred in its redaction ruling.

remedy will suffice to cure the prejudice" (internal quotation marks and citations omitted). *Id.* In our view, neither Allen nor Diggs suffered overwhelming prejudice from either the prosecutor's actions or the trial court's rulings, if they suffered prejudice at all.[14] The trial judge did not abuse his discretion in denying the motions for mistrial.

## IV. Improper Opening Statement

■ Allen asserts that the trial court should have granted his motion for mistrial based on certain statements the prosecutor made during opening statement. Specifically, the prosecutor stated: "[Allen] had a vehicle. He had a green Buick, a Buick that he lived out of because [Allen] was unemployed and this was kind of his home base." At the end of the prosecutor's opening, after the jury had recessed, both Diggs and Allen objected to this statement and requested that the court give the jury a corrective instruction. In addition, Allen moved for a mistrial because, in his view, "it's highly prejudicial that she mentioned the fact that he was unemployed." Citing to *Vitek v. State*, 295 Md. 35, 453 A.2d 514 (1982), the trial court agreed with defense counsel that the statement was improper, and that a corrective instruction was warranted. The court then recalled the jury and instructed them, in pertinent part, that, "as I mentioned earlier, what you hear in opening statement is not evidence. And I also instruct you that a person's employment status should not be considered as making it more likely or less likely that he or she would commit a crime." The court denied Allen's motion for mistrial.

In *Vitek*, the defendant was charged with committing robbery. At trial, he testified in his own defense. During cross-examination, the prosecutor inquired as to his financial situation at the time the robbery was committed, inferring that the

---

14. *Compare Tyner v. State,* 417 Md. 611, 621, 11 A.3d 824 (2011) (holding that an officer's testimony that "telling the truth" was an element of a witness cooperation agreement did not improperly bolster witness's credibility or encroach upon the jury's fact-finding obligations).

defendant had a motive for committing the robbery because he had just been released from prison and had no money. On appeal, the defendant argued that this line of questioning was impermissible because the evidence in that case failed to establish any causal link between the defendant's indigency and the robbery allegedly committed. *Id.* at 39, 453 A.2d 514. The Court agreed with the defendant, holding that "in order for such evidence to be admissible, there must be something more than a 'general suspicion' that because a person is poor, he is going to commit a crime." *Id.* at 41, 453 A.2d 514.

Returning to the present case, Allen did not, in our view, suffer overwhelming prejudice as a result of the prosecutor's statement. First, in contrast to *Vitek,* the statement at issue in the case at bar was not admitted into evidence. The prosecutor's statement was made during opening statements, and, as the trial judge properly instructed the jury on multiple occasions during the trial, opening statements do not constitute evidence. *See, e.g., Wilhelm v. State,* 272 Md. 404, 412, 326 A.2d 707 (1974) ("An opening statement by counsel is not evidence and generally has no binding force or effect."). Second, testimony elicited through other witnesses without objection established that the motive for the robbery of Gordon and Negussie was to obtain *drugs or money.* Thus, to the extent that the prosecutor's statement implied that Allen's employment status motivated him, in part, to commit the robbery, such implications are consistent with evidence properly admitted.[15] Third, no evidence produced during the trial indicated that Allen was indigent, nor do we read the prosecutor's statement as suggesting that Allen committed the robbery solely for financial reasons. Fourth, the trial judge in the instant case, unlike in *Vitek,* sustained appellants' objec-

---

15. *See also Kanaras v. State,* 54 Md.App. 568, 595–96, 460 A.2d 61 (1983) (holding that the admission of evidence that crimes committed were motivated by drugs and/or money was proper because evidence was based on more than "general suspicion"). As in *Kanaras,* the evidence admitted in the instant case that the robbery was committed to obtain drugs or money was based on more than general suspicion arising solely from the financial situation of either appellant.

tions and provided a curative instruction to the jury. In light of these observations, we cannot say that the trial court abused its discretion in denying Allen's motion for mistrial.

Allen also argues that, when viewed together, the prosecutor's attempt to introduce evidence of Jackson's criminal record and the prosecutor's statement about Allen's employment status rise to the level of overwhelming prejudice. We disagree. For the reasons already stated, neither instance, viewed individually or collectively, deprived Allen of a fair trial. *See McIntyre*, at 524, 897 A.2d 296.

### V. Excited Utterances

Allen asserts that the trial court erred in granting the prosecutor's motion in limine to prohibit the defense "from eliciting testimony regarding excited utterances made by codefendant Harris." Specifically, Allen argues that, in two instances immediately prior to and during his arrest, Harris yelled "Those mother F-rs shot at us" within earshot of Officer Drengwitz, and that he should have been permitted to introduce this evidence at trial as an exception to the hearsay rules.

Allen misconstrues the events at trial. Contrary to Allen's assertions, the trial judge *denied* the prosecutor's motion in limine, thereby leaving the door open as to whether appellants could properly admit Harris's statements. That appellants subsequently choose not to introduce this evidence does not, and cannot, constitute reversible error. *See Apenyo v. Apenyo*, 202 Md.App. 401, 424–25, 32 A.3d 511 (2011) ("The trial judge played no part in this, and it is, of course, only the trial judge who can commit reversible error.").

### VI. Hearsay and the Police Report

■■ Diggs argues that the trial court erred in restricting his cross-examination of Detective Natoli, the detective who obtained the search warrant for, and completed the search of, Harris's cellular phone. In the warrant affidavit, Natoli relied on a statement contained in the notes of another detective— Detective Frazier—who, according to Diggs, indicated that

Harris was seen tossing a gun under the Buick on the night of the incident. During his cross-examination of Detective Natoli, Diggs attempted to admit the notes of Detective Frazier into evidence—specifically, the statement about Harris tossing the gun—as an exception to the hearsay rule. *See* Rule 5–803(b)(8) (permitting the admission of public records meeting certain criteria).[16] The State objected, and the trial court sustained the objection.

Diggs argues that he should have been able to admit the statement about Harris into evidence because it falls within the scope of Rule 5–803(b)(8). We disagree. In *Ali v. State*, 314 Md. 295, 550 A.2d 925 (1988), the Court addressed a scenario comparable to the one before us. In that case, the Court determined that, even though police reports may, under certain circumstances, be admissible under the public records exception to the hearsay rule, this does not mean, as Diggs suggests, that hearsay contained within the report is also admissible. *Id.* at 305, 550 A.2d 925. Instead, the Court held that hearsay contained within a police officer's report was inadmissible except for purposes of impeachment. *Id.* In so holding, the Court explained that:

---

**16.** The rule provides:
(A) Except as otherwise provided in this paragraph, a memorandum, report, record, statement, or data compilation made by a public agency setting forth
 (i) the activities of the agency;
 (ii) matters observed pursuant to a duty imposed by law, as to which matters there was a duty to report; or
 (iii) in civil actions and when offered against the State in criminal actions, factual findings resulting from an investigation made pursuant to authority granted by law.
(B) A record offered pursuant to paragraph (A) may be excluded if the source of information or the method or circumstance of the preparation of the record indicate that the record or the information in the record lacks trustworthiness.
(C) A record of matters observed by a law enforcement person is not admissible under this paragraph when offered against an accused in a criminal action.
(D) This paragraph does not supersede specific statutory provisions regarding the admissibility of particular public records.

Embraced within the concept of direct sense impressions is not only what the officer sees, but also what the officer may hear, feel, taste, or smell, and if such sensory observations are properly recorded in a business record, they may be admissible. If what the officer hears is a "fact," such as an audible warning heard at a railroad gate crossing, and if that fact is relevant, it will be admissible. **Complications arise when what is heard and recorded is the speech of another. In that instance, one must determine whether the words spoken, because they may constitute second level hearsay, ought to be redacted from a report otherwise admissible. Logically, the first inquiry ought to be whether the words are hearsay at all. If they are not, their admission would not offend the hearsay rule. If they are, a further analysis must be undertaken to determine whether there exist separate circumstantial guarantees of trustworthiness sufficient to permit their admission as an exception to the hearsay rule.**

*Id.* at 303–04, 550 A.2d 925 (emphasis added).

Applying *Ali* to the facts before us, there is no dispute that Detective Frazier was not present at the scene at the time the gun was discarded, and, thus, had no personal knowledge as to whether Harris tossed the weapon. Detective Frazier's notes were purportedly based on representations by Officer Drengwitz, who was present at the scene. Because Diggs intended to admit the statement for its truth—i.e., did not intend to use the statement for purposes of impeachment[17]—it is hearsay. There being no applicable hearsay exception, the trial court properly excluded the statement from evidence.

Moreover, and in any event, Officer Drengwitz testified at trial, and Diggs chose not to question him about whether he witnessed Harris toss the gun beneath the Buick. Further, Detective Frazier was available to testify, and Diggs chose not to call him as a witness or question him about the notes. Diggs cannot now cry foul when he had ample opportunity at

---

**17.** Counsel for Diggs expressly stated to the trial court that he was not using the statement for impeachment purposes.

trial to question both the observer of the incident and the author of the notes.

## VII. Attorney–Client Privilege and Attorney Work Product

■ Allen argues that the trial court erred in admitting into evidence a letter entitled "Operation Ride Out" which was written by Allen while he was incarcerated and awaiting trial. The letter was addressed to the mother of one of Allen's children, with a note stating that Allen wanted her to send a copy of it to his trial attorney. Allen's counsel objected to the admission of the letter, and the trial court overruled the objection. In his appellate brief, Allen argues that the letter should not have been admitted into evidence because it was protected by the attorney-client privilege and was also attorney work product. We disagree with both of these contentions.

■ As the Court of Appeals stated in *Greenberg v. State,* 421 Md. 396, 26 A.3d 955 (2011), eight elements must be present in order for the attorney-client privilege to exist:

(1) Where legal advice of [any] kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his insistence permanently protected, (7) from disclosure by himself or by the legal adviser, (8) except the protection [may] be waived.

*Id.* at 409, 26 A.3d 955 (internal quotation marks and citations omitted).

Even if we were to assume, for purposes of our analysis, that the letter was written seeking legal advice—a conclusion not at all clear from the letter itself—the letter still fails this test because it was not made in confidence. It was addressed to the mother of one of Allen's children, not to his attorney, and indicates no preference for her to keep its contents secret or confidential. Evidencing this, there are portions of the letter which appear to be intended for Allen's mother, and portions of the letter in which Allen instructs the recipient to

pass along to other people various things recounted therein. *See Newman v. State*, 384 Md. 285, 304, 863 A.2d 321 (2004) (with some exceptions not here relevant, "[f]or a communication to be considered privileged, it cannot be intended for disclosure to third parties"). The attorney client privilege does not protect Allen's letter from admission into evidence.

The attorney work product doctrine "protects materials prepared in anticipation of litigation from disclosure." *Blair v. State*, 130 Md.App. 571, 607, 747 A.2d 702 (2000). "Two categories of attorney work product, fact and opinion, are included within the doctrine. Fact work product generally consists of materials gathered by counsel (or at counsel's instructions) in preparation of trial. Opinion work product concerns the attorney's mental processes. Neither fact nor opinion work product is ordinarily discoverable, but opinion work product, in particular, is almost always completely protected from disclosure." *Id.* at 607–08, 747 A.2d 702. "The work product doctrine is historically and traditionally a privilege of the attorney and not that of the client." *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 406, 718 A.2d 1129 (1998) (internal quotation marks and citations omitted); *see Blair*, at 605, 747 A.2d 702 ("the protections associated with the work product doctrine belong to the lawyer").

We conclude that the letter is not protected by the attorney work product doctrine. First, the attorney work product doctrine "is intended to protect and to act as a limitation upon pretrial discovery of a lawyer's strategies, legal theories and mental impressions. It was never intended to be an evidentiary privilege." *Morris v. State*, 59 Md.App. 659, 669, 477 A.2d 1206 (1984). Here, Allen is, in essence, attempting to use the attorney work product doctrine to remedy deficiencies in his argument that the letter was subject to the attorney client privilege. Second, the letter is not the product of an attorney. The letter was not written by Allen's counsel, and there is no evidence in the record that it was prepared by Allen at the instruction of counsel. Third, as explained above, the attorney work product doctrine is the

privilege of the attorney and not that of the client. Allen's counsel did not invoke the doctrine at trial, nor can we imply such from the record. Fourth, Allen, of his own volition, disseminated the information contained in the letter to third parties, thereby destroying, in this instance, the underlying purpose of the doctrine—i.e., to protect the attorney from the disclosure of his work product. Once voluntarily disseminated, the product is no longer protected by the attorney work product doctrine. *See United States v. Nobles,* 422 U.S. 225, 239, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) ("The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived."); *see, e.g., In re Martin Marietta Corp.,* 856 F.2d 619, 625 (4th Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989) (information voluntarily disclosed constitutes an implied waiver of attorney work product protections).

## VIII. Closing Argument

 Diggs argues that the trial court erred in permitting the prosecutor to comment on his trial demeanor in her closing argument. During argument, the prosecutor stated (emphasis added):

> [PROSECUTOR]: And the 7–Eleven video, the 7–Eleven video that shows Mr. Diggs in his khaki shorts, his dark hooded sweatshirt on June 24th, a warm night when the SAT officers are out in short sleeves, dark shirt, canvas colored shoes.
>
> Howard Diggs, who stands on that video, and he leans up against the counter like this, **and he's laughing, the same laugh, ladies and gentlemen, that you've seen from Howard Diggs for the past six days.**

The following exchange then occurred:

> [DIGG'S COUNSEL]: Your Honor, I object.
>
> THE COURT: Overruled.
>
> [DIGG'S COUNSEL]: I'd move for a mistrial, Your Honor.
>
> THE COURT: Denied.

[PROSECUTOR]: The same laugh, the same man, Howard Diggs. . . .

After closing arguments, counsel approached the bench:

[DIGG'S COUNSEL]: Your Honor, I just wanted to note the basis for my objection. I believe it was an impermissible reference to my client to not testifying with regard to [the prosecutor's] allusion to his smiling during the course of the trial.

THE COURT: Well, he did frequently smile and—

[DIGG'S COUNSEL]: He did, Your Honor.

THE COURT:—occasionally laugh, I don't think that's inappropriate to comment on.

In his appellate brief, Diggs argues that the prosecutor's comment infringed on his right against self-incrimination protected by the Fifth Amendment to the United States Constitution [18] and Article 22 of the Maryland Declaration of Rights.[19] In support of this position, Diggs cites to *Bryant v. State*, 129 Md.App. 150, 741 A.2d 495 (1999), *cert. denied*, 358 Md. 164, 747 A.2d 645 (2000). In *Bryant*, this Court succinctly described the circumstances before it:

The defendant in this case did not testify, and the State's argument related only to this courtroom conduct. Nowhere in the record is there to be found any reference to the alleged conduct of the accused. The prosecutor was arguing a fact not in evidence, and compounding that by adding her personal assurance that the alleged conduct occurred by saying, "We all saw it." The argument related to conduct of the accused that was entirely passive—his alleged failure to "look [the witness] in the eye." The argument was not, therefore, a comment on intentional conduct of an accused calculated to influence the jury. Moreover, the prosecutor

18. The Fifth Amendment provides, in pertinent part, that: "No person shall be ... compelled in any criminal case to be a witness against himself. . . ."

19. Article 22 provides: "That no man ought to be compelled to give evidence against himself in a criminal case."

argued her conclusion that the defendant's failure to "look her in the eye" was evidence of guilt—"He knew she was telling the truth."—a questionable inference at best. There may be any number of reasons why a defendant will not fix his or her gaze upon a witness, including a possible earlier instruction by defense counsel to avoid any possible implication that the defendant is attempting to intimidate or "stare down" a witness. The prosecutor should have focused on evidence that was before the jury, which may include fair comment on the demeanor of witnesses while they are on the stand, but which will ordinarily not include comments on the courtroom demeanor of the defendant.

*Id.* at 160, 741 A.2d 495. Then, quoting *Wilhelm v. State,* 272 Md. at 412, 326 A.2d 707, we explained that: "counsel may 'make any comment or argument that is warranted by the evidence proved or inferences therefrom' and [ ] the prosecutor is free 'to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments....' " *Bryant,* at 160–61.[20] We concluded that: "We do not understand [the above-quoted passage from Wilhelm] ordinarily to condone comments of the prosecutor on the passive courtroom demeanor of a nontestifying defendant."

The facts before us are distinguishable from *Bryant.* First, in the instant case, unlike in *Bryant,* the prosecutor's statement is premised on evidence admitted at trial. To this end, the surveillance video admitted into evidence shows a man laughing while at the store. The identity of this man is at issue in the trial.[21] In the above-quoted portion of her closing

---

**20.** *See also Lawson v. State,* 389 Md. 570, 591, 886 A.2d 876 (2005) (quoting and applying this standard); *Spain v. State,* 386 Md. 145, 152–53, 872 A.2d 25 (2005) (same); *Degren v. State,* 352 Md. 400, 430, 722 A.2d 887 (1999) (same); *Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707 (1974) (same).

**21.** In closing argument, Diggs's counsel suggested that the prosecution had failed to prove that Diggs was at the crime scene, arguing that "very little" of the physical evidence produced at trial, presumably including the 7–Eleven video, "comes back to Howard Diggs."

argument, the prosecutor argues that the man in the video is Diggs. The prosecutor first points out that the man in the video wears the same clothing as Diggs was seen wearing on the night in question. The prosecutor next suggests that the man in the video—who laughs and smiles on several occasions while at the 7–Eleven—has the same laugh as Diggs displayed in the courtroom. In our view, when put into proper context, the prosecutor, in so arguing, simply asked the jury to compare an aspect of the physical appearance and mannerisms of the man in the video, who is clearly visible on screen, to the physical appearance and mannerisms of Diggs, who sat in the courtroom before the jury. *See Bryant*, at 159, 741 A.2d 495 (suggesting that comments on the personal appearance of a defendant may be proper when "identity is in issue" (internal citations and quotation marks omitted)).

Second, the prosecutor did not, as in *Bryant*, equate the demeanor of Diggs with guilt. Nowhere in the prosecutor's argument did she state that Diggs was guilty because he laughed and smiled during trial. The prosecutor did not state, nor imply, that Diggs's laughter in the courtroom had anything to do with his decision not to testify at trial, or that he laughed as a reaction to events at trial.

Third, in contrast to *Bryant*, the prosecutor in the instant case did not give any personal assurances to the jury, nor did she use terms such as "I" or "we." Instead, the prosecutor simply argued that, based on what the jury observed on the video, they should conclude that Diggs, the man before them in the courtroom, was one of the men depicted—the man who was laughing.

Finally, the record in *Bryant* failed to support or disclose the basis for the prosecutor's characterization of the defendant's demeanor during trial. In contrast, in the present case, there is no dispute that Diggs occasionally laughed during trial.

■■■■■■ Counsel are afforded broad latitude in closing argument. As the Court of Appeals has explained:

"While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions."

*Lawson*, 289 Md. 571, 591, 886 A.2d 876 (2005) (quoting *Spain*, 386 Md. at 145, 872 A.2d 25). Placing the prosecutor's closing in the context of the evidence presented at trial and the scope given counsel in closing argument, we cannot say that the trial court abused its discretion in overruling Diggs's objection or in denying his request for a mistrial.

### IX. Jury Instructions

■ Both Allen and Diggs argue that the trial court failed to correctly instruct the jury on the issue of accomplice liability. On this point, the court instructed the jury that (formatting altered):

The defendants are charged with several crimes. A person who aids and abets in the commission of a crime is as guilty as the actual perpetrator, even though he or she did not personally commit each of the acts that constitute the crime. A person aids and abets the commission of a crime by knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed, and seeking by some act to make the crime succeed. In order to prove that the defendant aided and abetted the commission of a crime, the State must prove that the defendant was present when the crime was committed, and that the defendant willfully participated with the intent to make the crime succeed. "Presence" means being at the scene, or close enough to render assistance to the other perpetrators. "Willful participation"

means voluntary and intentional participation in the criminal act. Some conduct by the defendant in furtherance of the crime is necessary. The mere presence of the defendant at the time and place of the commission of the crime is not enough to prove that the defendant aided and abetted. But if presence is proven, it is a fact that may be considered, along with all the surrounding circumstances.

**It is not necessary to know his co-defendant was going to commit other crimes. Furthermore, the defendant need not have participated in any fashion in the other crimes. In order for the State to establish accomplice liability, the State must prove that the defendant actually committed the planned offense, or the defendant aided and abetted in the plan of criminal offenses. And the criminal offense not within the original plan w[as] done in furtherance of the commission of the planned criminal offense or the escape therefrom.**

All but the last paragraph of the court's instruction are quoted from the Maryland Criminal Pattern Jury Instruction ("MPJI–Cr") 6:01 (2005), promulgated by the Maryland State Bar Association.

Appellants first suggest that the court erred in giving this instruction and not the instruction for accomplice liability found in David E. Aaronson, *Maryland Criminal Jury Instructions and Commentary*, (3rd ed.2009) § 4.02.[22] This claim is not preserved for appellate review, and only Diggs requests

22. This instruction provides:
§ 4.02 **Aiding and Abetting**
_____ *(insert name of defendant) is* charged with having aided and abetted the commission of the crime of *(insert offense).* A person who is an aider and abettor may be guilty of the principal offense even though [he] [she] did not personally commit the act(s) constituting the offense.
In order for you to convict _____ *(insert name of defendant)* as an aider or abettor, the State must prove beyond a reasonable doubt that: (1) each of the elements of the underlying crime of _____ *(insert offense)* was committed by someone other than _____ *(insert name of defendant);* (2) _____ *(insert name of defendant)* was present at the scene of the crime or was close enough to provide assistance to the other participant(s); and, (3) _____ *(insert name of defendant) wilfully* partic-

that we exercise plain error review. In any event, there is no error, much less plain error, in the court instructing the jury pursuant to the appropriate section of the MPJI–Cr., and not pursuant to Professor Aaronson's proposed instructions.[23]

⬛ Appellants next assert that the trial court erred in including the last paragraph in the instruction. Even though the trial court recognized that this paragraph was not included in MPJI–Cr 6:01, the court determined that the added paragraph corresponded to the law as stated in *Sheppard v. State*, 312 Md. 118, 538 A.2d 773 (1988). In *Sheppard*, the Court was asked to determine whether the defendant was an accomplice to the crime of assault with intent to murder. *Id.* at 120, 538 A.2d 773. In that case, three men, including the defendant,

---

ipated with the intent to make the crime succeed. This means that the defendant must have committed one or more acts [or omission to act] that provided assistance and support intending to make the crime succeed.

The mere physical presence of the defendant at the time and place of commission of such offense is not, by itself, sufficient to prove [his] [her] guilt, but may be considered along with all the surrounding circumstances. [However, you may infer but are not required to infer from the defendant's presence at or near the scene of the crime coupled with other facts, such as standing by as a lookout for the other participant(s), that the defendant wilfully participated and aided in the commission of the crime.] It is necessary that the defendant wilfully participated by voluntarily and intentionally doing some act [or omission to act] to help make the crime succeed. In order for the defendant to be convicted as an aider and abettor, the State must prove beyond a reasonable doubt each of the elements of the underlying crime, including that the crime was committed by someone other than the defendant.

[The principal perpetrator of the offense need not be convicted, however, to convict the defendant as an aider or abettor.]

23. Likewise, Allen's assertion that the trial court did not properly instruct the jury that the State's burden of proof at trial was beyond a reasonable doubt is not preserved for appellate review. On this point, the jury was instructed, in pertinent part, that: "The State has the burden of proving the guilt of the defendant beyond a reasonable doubt." There is no error, much less plain error, with this instruction. *See Carroll v. State*, 428 Md. 679, 692, 53 A.3d 1159 (2012) ("[W]e are, in the end, not persuaded that an otherwise-correct reasonable doubt instruction is rendered constitutionally deficient by the omission of language that each element of the offense charged must be proven beyond a reasonable doubt.").

robbed two store clerks and then jumped into an escape car driven by a fourth man. The car was subsequently stopped by police. The defendant was apprehended by one of the officers as he attempted to escape from the car, but the remaining men escaped into the woods. Police officers pursued the robbers and, during the chase, one of the men fired shots at the officers. *Id.* at 120–21, 538 A.2d 773. The Court determined that, on the facts of that case, the defendant was an accomplice to the shooting. *Id.* at 125, 538 A.2d 773. In so holding, the Court first explained that:

> As a general rule, when two or more persons participate in a criminal offense, each is responsible for the commission of the offense and for any other criminal acts done in furtherance of the commission of the offense or the escape therefrom.

*Id.* at 121–22, 538 A.2d 773. The Court then explained that:

> An accomplice is a person who, as a result of his or her status as a party to an offense, is criminally responsible for a crime committed by another. This responsibility, known as accomplice liability, takes two forms: (1) responsibility for the planned, or principal offense (or offenses), and (2) responsibility for other criminal acts incidental to the commission of the principal offense. In order to establish complicity for the principal offense, the State must prove that the accused participated in the offense either as a principal in the second degree (aider and abettor) or as an accessory before the fact (inciter). In order to establish complicity for other crimes committed during the course of the criminal episode, the State must prove that the accused participated in the principal offense either as a principal in the first degree (perpetrator), a principal in the second degree (aider and abettor) or as an accessory before the fact (inciter) and, in addition, the State must establish that the charged offense was done in furtherance of the commission of the principal offense or the escape therefrom.

*Id.* at 122–23, 538 A.2d 773 (internal citations omitted).

The State argues that the additional instructions provided to the jury were not erroneous in light of *Sheppard.* We

agree. A fair reading of the added instructions establishes they were merely a summary of the principles set forth in *Sheppard*, rephrased in more commonly understood language.

Appellants next argue that the instructions permitted the jury to convict appellants of attempted first degree murder without first determining that each element of the underlying crime was committed.[24] They argue, specifically, that the jury could have convicted appellants of attempted first degree murder without concluding that the crime had been premeditated and deliberated. We disagree.

Contrary to appellants' assertions, the instructions given did not instruct the jury to convict appellants absent the existence of all the elements of the underlying crime of attempted first degree murder. The jury was first instructed as to intent (formatting altered):

> Intent is a state of mind, and ordinarily cannot be proven directly, because there is no way of looking into a person's mind. Therefore, a defendant's intent may be shown by surrounding circumstances. In determining a defendant's intent, you may consider the defendant's acts and statements, as well as the surrounding circumstances. Further, you may, but are not required to, infer that a person ordinarily intends the natural and probable consequences of his acts.

Then, as to attempted first degree murder, the jury was instructed, in pertinent part, that (formatting altered, emphasis added):

> In order to convict the defendant of attempted murder in the first degree, the State must prove that the defendant took a substantial step beyond mere preparation toward the commission of murder in the first degree, that the defendant had the apparent ability at that time to commit the crime of murder with the first degree, and **that the defendant willfully and with premeditation and deliberation**

---

**24.** Appellants focus their argument on this point solely on their convictions for attempted first degree murder. We do the same.

intended ... **to kill Jeremy Gordon.** "Willful" means that the defendant actually intended to kill the victim. "Deliberate" means that the defendant was conscious of the intent to kill. "Premeditated" means that the defendant thought about the killing, and that there was enough time, though it may only have been brief, for the defendant to consider the decision whether or not to kill, and enough time to weigh the reasons for and against the choice.

Appellants do not contend that either of these instructions were incorrect or given in error. The accomplice instruction, in turn, provided that, to find someone guilty as an accomplice, the jury was first required to find that the "crime was committed"—i.e., that the above-quoted instruction for attempted first degree murder was satisfied, including the premeditation and deliberation elements. *See Tharp v. State,* 129 Md.App. 319, 329, 742 A.2d 6 (1999) ("[S]o long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them.").

 Lastly, appellants argue that it was error for the trial court not to explicitly state to which crimes the instruction applied. We disagree. The trial court's decision to instruct the jury that the defendant was charged with "several crimes" rather than listing out the specific crimes does not constitute error, nor have appellants shown that any prejudice resulted from this phraseology. Prior to reading the accomplice instruction, the trial court specifically instructed the jury as to what crimes appellants had been charged with, and there is no indication in the record that the jurors were confused as to what charges were at issue before them. Moreover, the accomplice instruction potentially applied to all of the charges against appellants, depending on what facts the jury believed or disbelieved. The trial court did not err in its instructions to the jury.

## X. Sufficiency of the Evidence

Appellants argue that the evidence produced at trial was legally insufficient for the jury to find them guilty of attempted first degree murder. The prosecution conceded at trial

that they could not prove the identity of the shooter. Instead, its theory as to why either or both of appellants were guilty of attempted first degree murder was premised on accomplice liability. In a vein similar to their arguments in Part IX, appellants assert that the prosecution failed to present any evidence of premeditation and deliberation at trial. Allen also contends that, even if the prosecutor presented sufficient evidence to show that the shooter possessed the requisite *mens rea* for attempted first degree murder—i.e., that, after premeditating and deliberating, the shooter was shooting with the intent to kill—no evidence was presented that Allen shared in this *mens rea.*

"In reviewing the sufficiency of the evidence to support a criminal conviction, the standard to be applied is whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Owens v. State,* 161 Md.App. 91, 99, 867 A.2d 334 (2005). "In other words, a guilty verdict may be set aside only if there is no legally sufficient evidence or inferences drawable therefrom on which the jury could find the accused guilty beyond a reasonable doubt." *Morgan v. State,* 134 Md.App. 113, 121, 759 A.2d 306 (2000). Applying this standard to the facts before us, we will each take of appellants' contentions in turn.

### 1. Premeditation and Deliberation

Both appellants argue that the prosecution failed to produce sufficient evidence that the shooting was premeditated and deliberate. Pursuant to Md.Code Ann. (2002) § 2–201 of the Criminal Law Article, murder in the first degree, as charged in this case, requires a showing that the murder was "a deliberate, premeditated, and willful killing." Likewise, as charged, attempted first degree murder requires a showing that the crime was wilful, deliberate, and premeditated. The Court of Appeals summarized this requirement in *State v. Holmes,* 310 Md. 260, 528 A.2d 1279 (1987), explaining that:

the elements of attempted murder in the first degree are the intent to commit murder in the first degree and some

overt act towards the crime's commission. Moreover, we have repeatedly held that the intent required for first degree murder is that it shall have been wilful, deliberate, and premeditated. Thus, to prove attempted murder in the first degree, the State was required to prove that [the defendant] had the wilful, deliberate, and premeditated intent to kill, and that he committed some overt act towards that end.

*Id.* at 271–72, 528 A.2d 1279.

Here, there was sufficient evidence presented at trial to establish that the shooter had the wilful, deliberate, and premeditated intent to kill. While Gordon was trying to make good his escape, the shooter fired at him four or five times from inside the apartment. The shooter, along with the two remaining men, then chased Gordon out of the apartment, firing seven to ten more shots once outside. One of these shots hit Gordon in the lower back. Not only does this evidence indicate that the shooter deliberately intended to kill Gordon by shooting at him multiple times, but it also shows that the shooter had ample time to premeditate—especially between the first and second volleys of gunfire. *See State v. Raines*, 326 Md. 582, 590, 606 A.2d 265 (1992) ("However short the period between the intention and the act, if the killing results from a choice made as the consequence of thought, the crime is characterized as deliberate and premeditated murder.").

## 2. Accomplice Liability

Allen also argues that the evidence, even if sufficient to convict the shooter of attempted first degree murder, was insufficient to establish that he was guilty of attempted first degree murder under a theory of accomplice liability. Specifically, Allen argues that the evidence failed to show that he shot at Gordon or intended to kill Gordon, and maintains that such was necessary in order to convict him of attempted first degree murder. We disagree.

In support of his contention, Allen cites to *State v. Williams*, 397 Md. 172, 194–95, 916 A.2d 294 (2007). In *Williams*, the Court of Appeals explained that:

Aid or encouragement to another who is actually perpetrating a felony will not make the aider or encourager guilty of the crime if it is rendered without *mens rea*. It is without *mens rea* if the giver does not know or have reason to know of the criminal intention of the other. . . .

*Id.* at 194, 916 A.2d 294 (internal quotation marks and citations omitted). Allen suggests that this language establishes that, in order to convict him of attempted first degree murder, the State was required to prove that he personally intended to kill Gordon.

 This argument misses the mark and is inconsistent with the evidence at trial.[25] After making the above-quoted statement, the *Williams* Court then set forth the standard applicable in the instant case:

when two or more persons participate in a criminal offense, each is responsible for the commission of the offense and for any other criminal acts done in furtherance of the commission of the offense or the escape therefrom.

*Id.* at 195, 916 A.2d 294 (quoting *Raines*, 326 Md. at 598, 606 A.2d 265) (brackets removed). *See also Owens*, 161 Md.App. at 105–06, 867 A.2d 334; *Sheppard*, 312 Md. at 121–22, 538 A.2d 773; *Veney v. State*, 251 Md. 159, 246 A.2d 608 (1968), *cert. denied*, 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969) (quoting 1 Wharton, Criminal Law and Procedure, s. 90 (1957) ("Each conspirator is responsible for everything done by his confederates which follows incidentally as one of the probable and natural consequences in the execution of the common design, even though such a consequence was not intended as a part of the original design or common plan.")). Here, Gordon was shot during the commission of the armed robbery. There was ample evidence presented at trial that Allen intended to

---

**25.** Allen confuses the facts of the instant case with a circumstance where a person unknowingly aids or assists or furthers a criminal act without knowledge that the undertaking was of a criminal nature.

commit the armed robbery, participated in the planning of the scheme, and actively participated in the robbery. This constitutes sufficient evidence for the jury to conclude that Allen had sufficient *mens rea* to be held accountable for the shooting, even if he was not the triggerman.

**THE JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY ARE AFFIRMED.**

**APPELLANTS TO PAY COSTS.**